UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KAWAUNE GREGORY PEARSON,

        Plaintiff,

    v.

DR. GOLUBYATNIKOV,

        Defendant.

No.  2:  12-cv-1751 KJN P

ORDER

Introduction

      Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  The parties consented to the jurisdiction of the undersigned.  (ECF No. 82.)

      Plaintiff alleges that defendant Golubyatnikov provided him with inadequate dental care in violation of the Eighth Amendment.[1]  Pending before the court is defendant's summary judgment motion.  (ECF No. 84.)  For the following reasons, defendant's motion is granted.

Preliminary Matters

      In his April 3, 2014 reply to plaintiff's opposition, defendant observes that plaintiff failed to submit any evidence in support of his opposition.  (ECF No. 87 at 1.)  Apparently in response to this statement in the reply, on April 10, 2014, plaintiff filed a motion for an extension of time

---

[1]  Plaintiff's state law claim was dismissed for failing to submit a timely tort claim.  (ECF Nos. 26, 30, 39.)

1    to re-submit exhibits.  (ECF No. 88.)  Plaintiff requests an extension of time to submit or "regain"

2    exhibits that were damaged or destroyed by officials at the California Medical Facility ("CMF")

3    prior to his transfer from that prison.  (Id. at 1.)  Plaintiff also alleges that he has submitted these

4    documents in the past.  (Id.)  Plaintiff requests that defendant be ordered to clarify his statement

5    in the reply that plaintiff submitted "no evidence" in support of his opposition.  (Id.)   For the

6    following reasons, this motion is denied.

7          To the extent plaintiff requests an extension of time to file evidence in support of his

8    opposition, this request is denied.  The court has previously advised plaintiff of the requirements

9    for opposing summary judgment motions.  (ECF No. 11.)   Plaintiff had notice that his opposition

10    was required to contain evidence supporting his claims or cite evidence in the record supporting

11    his claims.  Plaintiff may not supplement his opposition in response to defendant's reply.

12          Moreover, plaintiff is requesting an extension of time to "regain" exhibits that were

13    allegedly damaged or destroyed by officials at CMF.  On November 4, 2013, plaintiff filed a

14    notice of change of address reflecting his transfer from CMF to the R.J. Donovan Correctional

15    Facility ("RJDCF").  (ECF No. 74.)  Plaintiff has not demonstrated why he waited until

16    defendant's summary judgment motion was fully briefed, i.e. approximately four months after his

17    transfer away from CMF, to request an extension of time to obtain documents allegedly damaged

18    or destroyed by CMF officials.

19          Following the filing of his motion for extension of time, plaintiff filed several pleadings

20    suggesting that he submitted evidence in support of his claims prior to the filing of defendant's

21    summary judgment motion.  The undersigned describes these pleadings, which are difficult to

22    understand, herein.

23          On April 16, 2014, plaintiff filed a pleading titled "motion of verification and exhibit

24    'A.'"  (ECF No. 90.)  Attached to this pleading are pages of plaintiff's deposition transcript.  (Id.)

25    Plaintiff's deposition was taken on August 23, 2013.  (Id.)  In this portion of the transcript,

26    plaintiff discusses his exhibits.  (Id.)  Plaintiff appears to allege that his deposition transcript

27    reflects that he previously submitted evidence in support of his claims.

28    ////

2

1    On April 21, 2014, plaintiff filed a "motion/notice of exhibits (A) executed April 11, 2014

2    and mailed April 13, 2014 with proof of service." (ECF No. 91.)  In this pleading, plaintiff

3    appears to allege that he submitted evidence in support of his claims prior to the filing of

4    defendant's summary judgment motion.  (Id.)

5    On June 12, 2014, plaintiff filed a pleading requesting information regarding whether his

6    exhibit packet was received.  (ECF No. 92.)  On July 14, 2014, plaintiff filed a motion for review.

7    (ECF No. 93.)  Although largely unintelligible, this pleading appears to claim that plaintiff

8    previously submitted evidence in support of his claims.

9    It is not the undersigned's duty to review the entire record in order to determine whether

10   plaintiff has previously submitted evidence in support of his claims.  See Carmen v. San

11   Francisco Unified School District, 237 F.3d 1026, 1031 (9th Cir. 2001) (principle that the court

12   need not comb through scores of documents to determine if the suit may proceed, used in the

13   context of a summary judgment motion).

14   Nevertheless, in an abundance of caution, the undersigned has reviewed the court record

15   to determine whether plaintiff submitted any evidence in support of his claims.  The undersigned

16   located one pleading containing exhibits going to the merits of plaintiff's claims, i.e., plaintiff's

17   May 7, 2013 "Request for Second Review by Court..." (ECF No. 54.)  It appears that this

18   pleading was further briefing in support of plaintiff's opposition to defendant's motion to dismiss

19   his state law claim.  Attached to this pleading are administrative appeals and medical records

20   regarding plaintiff's claim that defendant provided inadequate dental care.  (Id. at 23-25, 33-42.)

21   The undersigned has reviewed these records and finds that they are, largely, in conformity with

22   defendant's statement of undisputed facts.  In evaluating defendant's summary judgment motion,

23   the undersigned has considered these records to the extent that they are relevant.

24   Finally, in an unrelated matter, the undersigned observes that on March 17, 2014 plaintiff

25   filed a motion to vacate the order granting defendant an extension of time to file a dispositive

26   motion.  (ECF No. 83.)  This motion is denied as without merit.

27   ////

28   ////

3

1  Legal Standard for Summary Judgment

2        Summary judgment is appropriate when it is demonstrated that the standard set forth in

3  Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

4  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

5  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

6        Under summary judgment practice, the moving party always bears the initial

7  responsibility of informing the district court of the basis for its motion, and identifying those

8  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

9  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

10  of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

11  R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving

12  party need only prove that there is an absence of evidence to support the non-moving party's

13  case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

14  627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

15  56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not

16  have the trial burden of production may rely on a showing that a party who does have the trial

17  burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

18  judgment should be entered, after adequate time for discovery and upon motion, against a party

19  who fails to make a showing sufficient to establish the existence of an element essential to that

20  party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

21  U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

22  party's case necessarily renders all other facts immaterial."  Id. at 323.

23        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

24  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of such a factual dispute, the opposing party may not rely upon the

27  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

28  form of affidavits, and/or admissible discovery material in support of its contention that such a

1  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

2  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

3  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

5  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

6  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

7  (9th Cir. 1987).

8       In the endeavor to establish the existence of a factual dispute, the opposing party need not

9  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

10  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

12  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

13  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

14  amendments).

15       In resolving a summary judgment motion, the court examines the pleadings, depositions,

16  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

17  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

18  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

19  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

20  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

21  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

22  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

23  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

24  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

25  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

26  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

27  ////

28  ////

5

1  Legal Standard for Eighth Amendment Claim

2       Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or

3  illness, gives rise to a claim under the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97,

4  105 (1976.)  This applies to physical as well as dental and mental health needs.  See Hoptowit v.

5  Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).

6       There are two prongs to the deliberate-indifference analysis: an objective standard and a

7  subjective standard.  First, a prisoner must show a "serious medical need."  Jett v. Penner, 439

8  F.3d 1091, 1096 (9th Cir. 2006) (citations omitted).  A "'serious' medical need exists if the failure

9  to treat a prisoner's condition could result in further significant injury or the 'unnecessary and

10  wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992),

11  overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

12  banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical

13  need include "[t]he existence of an injury that a reasonable doctor or patient would find important

14  and worthy of comment or treatment; the presence of a medical condition that significantly

15  affects an individual's daily activities; or the existence of chronic and substantial pain."

16  McGuckin, 974 F.2d at 1059–60.

17       Second, a prisoner must show that the defendant's response to that need was deliberately

18  indifferent.  Jett, 439 F.3d at 1096.  An official acts with deliberate indifference if he "knows of

19  and disregards an excessive risk to inmate health or safety; the official must both be aware of

20  facts from which the inference could be drawn that a substantial risk of serious harm exists, and

21  he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "Prison

22  officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay,

23  or intentionally interfere with medical treatment," Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.

24  2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's

25  pain or possible medical need.  Jett, 439 F.3d at 1096.  But the deliberate-indifference doctrine is

26  limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or

27  treating a medical condition does not support an Eighth Amendment claim.  Wilhelm v. Rotman,

28  680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).  Further, a mere difference in medical

opinion does not establish deliberate indifference.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Undisputed Facts

Defendant filed a statement of undisputed facts.  (ECF No. 84-3.)  Plaintiff did not file a response to defendant's statement of undisputed facts or his own statement of undisputed facts. Accordingly, defendant's statement of undisputed facts is adopted herein, to the extent it is not disputed by plaintiff's verified pleadings.

Defendant Golubyatnikov is a licensed dentist employed by the State of California.  (ECF No. 84-8 at 1.)  Defendant has been employed as a dentist by the California Department of Corrections and Rehabilitation ("CDCR") at Folsom State Prison ("FSP") since July 2003.  (Id.)

Hemophilia B is an inherited disorder of coagulation and thrombosis (the formation of a blood clot inside a blood vessel) in which the afflicted patient has insufficient amounts of a particular chemical (factor IX or 9) that is required to clot blood.  (ECF No. 85 at 2.)  Persons with hemophilia B experience very much the same symptoms as persons with the far more common condition of hemophilia A where blood clots form poorly for lack of factor VII.  (Id.)

In both hemophilia A and B, persons can be affected to only a mild degree or more seriously.  (Id.)  Over time, recipients of human plasma derivatives face incremental risks of contracting AIDS and hepatitis despite best efforts to screen out contaminated blood products. (Id. at 2-3.)  The risks associated with the use of blood products has lead clinicians to rely upon purified and/or genetically engineered products to treat bleeding without the risks of concentrated human blood products.  (Id.)

Compared to hemophilia A, treatment for hemophilia B is particularly hazardous in that the manufactured concentrates, despite their safety in not spreading infection, may paradoxically increase clots or be "thrombogenic" in some patients.  (Id. at 3.)

Defendant works at FSP from 5:30 a.m. to 4:00 p.m.  (ECF No. 84-8 at 1.)  Defendant was first scheduled to treat plaintiff on July 13, 2011.  (Id.)  Prior to treatment, defendant reviewed plaintiff's health and dental records.  (Id.)  Based on this review, defendant found that two days before arriving at FSP, plaintiff signed a Health Care Request form asking to have tooth #18

pulled.  (Id.)

Plaintiff was transferred to FSP on June 30, 2011.  (Id. at 1-2).  Plaintiff was seen by Dr. Cardeno on July 6, 2011, who noted that plaintiff had been diagnosed with hemophilia B and had arrived at the prison with stocks of Factor 9, which was to be kept in the Triage and Treatment Area ("TTA") in case plaintiff needed it.  (Id. at 2.)  The TTA is an urgent care center in the prison.  (Id.)  Dr. Cardeno renewed plaintiff's Factor 9 prescription.  (Id.)  Dr. Cardeno's note states that the factor 9 was to be used "PRN injury, before surgery or for bleeding."  (Id. at 10.)

On July 13, 2011, defendant saw plaintiff for a comprehensive dental examination.  (Id. at 2.)  Defendant reviewed plaintiff's Dental Health History Record with plaintiff.  (Id.)  The record provided that plaintiff had bleeding and clotting problems.  (Id.)

Upon examination, defendant found that plaintiff had chronic periodontitis in tooth #18 (second molar on lower left side of the jaw).  (Id.)  Periodontitis is a serious gum infection that damages the soft tissue and destroys the bone that supports the teeth.  (Id.)  Untreated periodontitis will eventually result in tooth loss, and may increase the risk of stroke, heart attack and other health problems.  (Id.)  Based on this diagnosis, defendant informed plaintiff that his tooth #18 should be extracted.  (Id.)

The extraction of tooth #18 was scheduled for September 12, 2011.  (Id.)  Before the extraction, defendant reviewed CDCR dental protocols for patients with bleeding problems and plaintiff's medical and dental records once more.  (Id.)  Defendant took note that plaintiff was seen by a hematologist, Dr. Chang, on May 23, 2011.  (Id.)  Dr. Chang's impression was that plaintiff had a history of hemophilia B, which was most likely mild, meaning his Factor 9 was greater than 5%.  (Id.)  In his May 23, 2011 report, Dr. Chang suggested that plaintiff receive Factor 9 when "injured, bleeding or surgery."  (Id. at 17.)  Defendant also noted that Factor 9 was available in the TTA should plaintiff need it for excessive bleeding.  (Id. at 2-3.)

Based on defendant's review of plaintiff's medical history, the dental examination he conducted on July 13, 2011, and the type of extraction that was to be performed, defendant did not believe that intravenous injections of Factor 9 would be needed before the extraction.  (Id. at 3.)  Plaintiff had mild hemophilia B and, in the past, only needed Factor 9 injections after he

8

received major injuries, i.e., gunshot wounds.  (Id.)  When defendant examined plaintiff on July 13, 2011, he physically probed his gum sockets and did not see any abnormal bleeding.  (Id.)  Further, the extraction of tooth #18 was only a minimally invasive procedure.  (Id.)  Because it was not major surgery, defendant did not believe it was necessary to provide Factor 9 to plaintiff. (Id.)

On September 12, 2011, defendant reviewed plaintiff's medical records again and found that there were no changes in plaintiff's condition and his hemophilia was stable.  (Id.)  Defendant performed the extraction of tooth #18 without difficulty.  (Id.)  Following the extraction, defendant placed Gelfoam into the socket of the extraction site, and gave plaintiff two sutures to close the tissue.  (Id.)  Gelfoam is a sterile compressed sponge that it applied to a bleeding surface to slow the flow of blood and facilitate blood clotting.  (Id.)  The insertion of Gelfoam and sutures are not normally performed after a tooth extraction.  (Id.)  However, defendant performed these extra precautions to promote healing of the extraction site and to reduce the possibility of extra bleeding.  (Id.)

After applying the Gelfoam and suturing the extraction site, defendant placed gauze over the site and applied pressure to stop any normal bleeding as a result of the extraction.  (Id.)  Normally, bleeding after an extraction may continue for several hours.  (Id.)  The best way to stop bleeding is to place gauze over the extraction site and gently bite to apply pressure for 30 to 60 minutes.  (Id.)

Defendant prescribed penicillin and ibuprofen for pain.  (Id.)  Defendant also gave plaintiff extra gauze and informed him that if he had bleeding to change the gauze and apply pressure.  (Id. at 3-4.)  Defendant informed plaintiff that Factor 9 was in the TTA if needed.  (Id. at 4.)

Defendant had plaintiff sit in the dental chair while he wrote his progress notes of the treatment provided to plaintiff that day.  (Id.)  Defendant made plaintiff wait to ensure that that he was not bleeding abnormally.  (Id.)  After writing his notes, defendant checked the extraction site again to see if there was abnormal bleeding.  (Id.)  Defendant did not notice any abnormal swelling or bleeding.  (Id.)  As an extra precaution, defendant had plaintiff sit in the dental clinic

9

waiting room for approximately 20 minutes.  (Id.)  Defendant then checked the site again and did not see bleeding, so he released plaintiff back to his cell.  (Id.)

Defendant left FSP on September 12, 2011, around 4 p.m., after his shift had concluded.  (Id.)  Prior to leaving FSP that day, defendant did not hear any complaints from plaintiff about bleeding from the extraction site.  (Id.)

On the evening of September 12, 2011, Dr. Skeoch was the on-call dentist at FSP.  (ECF No. 84-7 at 1.)  On September 12, 2011, Dr. Skeoch received a phone call at home at about 6:05 p.m. from Nurse Aseel at FSP informing him that plaintiff was bleeding from extraction site #18.  (Id. at 2.)  Dr. Skeoch advised Nurse Aseel to place a wet tea bag over the extraction site and to apply pressure with gauze in an attempt to stop the flow of blood and get it to clot.  (Id.)  Dr. Skeoch told Nurse Aseel that he would call back in 20 to 30 minutes to check on plaintiff's condition.  (Id.)

At 6:30 p.m., Dr. Skeoch called Nurse Aseel and was informed that plaintiff was still bleeding, so Dr. Skeoch decided to go to the prison.  (Id.)  Dr. Skeoch arrived at the prison hospital at 7:00 p.m., and observed that plaintiff's bleeding was not controlled by pressure.  (Id.)  As a result, Dr. Skeoch called the Dental Supervisor, Dr. Puig, to discuss plaintiff's condition.  (Id.)  Because it was not known that stocks of Factor 9 were in the prison, Dr. Puig and Dr. Skeoch determined that plaintiff should be sent to San Joaquin General Hospital to obtain a Factor 9 injection.[2]  (ECF Nos. 84-7 at 2, 84-6 at 1-2.)  Dr. Skeoch placed plaintiff on a saline IV to replace his blood volume and stayed with him until the medical transportation arrived to take plaintiff to the hospital.  (ECF No. 84-7 at 2.)

When Dr. Skeoch saw plaintiff on September 12, 2011, he was not informed by plaintiff or Nurse Aseel that there was a stock of Factor 9 available in the TTA.  (Id.)  It was discovered, after plaintiff went to the hospital, that Factor 9 was in the TTA.  (Id.)  The pharmacist from FSP had to drive plaintiff's Factor 9 to San Joaquin General Hospital so that plaintiff could be injected

---

[2]   In his opposition, plaintiff claims that no Factor 9 was available at the prison.  Plaintiff offers no evidence to support this claim.  Accordingly, the undersigned finds that this conclusory statement is insufficient to rebut defendant's evidence that Factor 9 was available at the prison.

1   with it.  (Id.)

2          Had Dr. Puig known that the Factor 9 was in the TTA, plaintiff could have received it at

3   FSP.  (ECF No. 84-6 at 2.)

4          When defendant arrived at work on the morning of September 13, 2011, he planned to

5   follow-up with plaintiff, but was informed that plaintiff had been sent to San Joaquin General

6   Hospital to receive a Factor 9 injection due to excessive bleeding.  (ECF No. 84-8 at 4.)

7   Defendant called San Joaquin General Hospital later that afternoon and was informed that

8   plaintiff still had mild bleeding, but he received the Factor 9 injections and was in stable

9   condition.[3]  (Id. at 4-5.)

10         When plaintiff returned to FSP, defendant updated plaintiff's dental records to indicate

11  that the doctor at San Joaquin General Hospital had recommended that, in the future, plaintiff

12  should receive an injection one to two hours before any surgery, including tooth extractions, and

13  if it is a big surgery, he should also receive it three to four days after surgery.[4]  (Id. at 5.)

14         Dr. Puig saw plaintiff for a follow-up appointment on September 16, 2011, a day after he

15  returned from San Joaquin General Hospital.  (ECF No. 84-6 at 2.)  Dr. Puig reviewed plaintiff's

16  chart and visually inspected the extraction site.  (Id.)  Dr. Puig found that plaintiff was healing

17  well.  (Id.)

18  ////

19  _____

20  [3]   In his declaration, defendant states that on September 13, 2011, he spoke with plaintiff's
    primary care provider, Dr. Cardeno, about the extraction and the precautions that defendant took.
    (ECF No. 84-8 at 4.)  Defendant states that Dr. Cardeno agreed with the approach that he took
21  and that medicating plaintiff with Factor 9 before the extraction was not medically necessary.
    (Id.)  In support of this statement, defendant refers to an exhibit identified as "dental 68."  (Id.)
22  This exhibit is defendant's entry in plaintiff's medical records from September 13, 2011, stating
    that he spoke with Dr. Cardeno who stated that no special premedication was needed before the
23  dental procedure.  (Id. at 23.)  The record contains no declaration from Dr. Cardeno that he made
    this statement.
24

25  [4]   In his declaration, defendant cites exhibits "dental 64" and "medical 868" as containing the
    recommendation from the doctor at San Joaquin General Hospital regarding when plaintiff should
26  receive the Factor 9 injections.  (ECF No. 84-8 at 5.)  The court cannot locate an exhibit labeled
    "medical 868" attached to defendant's declaration.  Exhibit "dental 64" is an entry in plaintiff's
27  record by defendant stating that that the doctor at the hospital made the recommendations alleged.
    (Id. at 25.)
28

1    Discussion

2          Plaintiff alleges that defendant acted with deliberate indifference to his serious medical

3    needs by failing to give him Factor 9 prior to the tooth extraction.  Defendant moves for summary

4    judgment on grounds that he did not act with deliberate indifference to plaintiff's medical needs.

5    Defendant does not appear to dispute that plaintiff meets the objective component of deliberate

6    indifference standard,  i.e., he had a serious medical need.  Defendant moves for summary

7    judgment as to the subjective component of the deliberate indifference standard.

8          In support of his motion, defendant has also provided the declaration of Dr. Bruce Barnett,

9    the Chief Medical Officer for the California Health Care Services, Receiver's Office of Legal

10   Affairs.  (ECF No. 85.)  Dr. Barnett states that after reviewing plaintiff's medical records,

11                It appears from the medical records and declaration of Dr.
12         Golubyatnikov, that the tooth extraction at issue was considered to
           be a minor surgical procedure that would cause only trivial
13         bleeding, one for which no prophylactic additional factor IX
           treatment was needed.   Dr. Golubyatnikov testifies in his
14         declaration that he was aware and concerned about Mr. Pearson's
           hemophilia B diagnosis, and was also aware that factor IX was
15         available in the prison if needed for unexpected bleeding.

16                ****

17                Based on the medical reports, declarations, my training and
           experience, I see no evidence that Dr. Golubyatnikov acted with
18         deliberate indifference to Mr. Pearson's medical condition.  Mild
           hemophilia B does not require prophylactic administration of factor
19         IX for procedures not anticipated to cause much bleeding.
           Moreover, there are risks associated with administration of factor
20         IX, as described above.   Accordingly the judgment not to
           administer factor IX unless excessive bleeding made it necessary to
21         do so was reasonable and not a deliberately indifferent act in
           regards to Mr. Pearson's medical condition.

22   (Id. at 3-4.)

23         In his reply, plaintiff argues that defendant reviewed medical records indicating that

24   administration of Factor 9 was warranted.  Plaintiff refers to Dr. Cardeno's order renewing the

25   factor 9 prescription which stated that factor 9 was to be used "PRN injury, before surgery or for

26   bleeding."  In addition, plaintiff's hematologist, Dr. Chang, also recommended that plaintiff

27   receive Factor 9 when "injured, bleeding or surgery."

28   ////

                                            12

1    As it turned out, plaintiff faced a serious risk of harm by not receiving Factor 9 prior to the

2    extraction.  Plaintiff's exhibits, filed May 7, 2013, contain medical records indicating that

3    plaintiff had a recurrence of bleeding after he returned to FSP from San Joaquin General Hospital

4    and was returned to the hospital for further treatment.  (ECF No. 54 at 35.)   Plaintiff's suffered

5    more serious problems following the tooth extraction then represented by defendant in his

6    summary judgment motion.  However, for the following reasons, the undersigned finds that

7    defendant did not act with deliberate indifference to plaintiff's serious medical needs by failing to

8    give plaintiff Factor 9 prior to extracting his tooth.

9    The evidence demonstrates that defendant was unaware of facts from which an inference

10   could be drawn that failing to give plaintiff Factor 9 before the extraction put plaintiff at a

11   substantial risk of serious harm.  See  Farmer, 511 U.S. at 837 (to act with deliberate indifference,

12   official must be aware of facts from which the inference could be drawn that a substantial risk of

13   serious harm exists).

14   In deciding not to give plaintiff Factor 9, defendant noted that plaintiff had mild

15   hemophilia B.  Defendant knew that plaintiff had only required Factor 9 in the past for major

16   injuries.  While defendant was aware of the recommendations by Dr. Cardeno and Dr. Chang that

17   plaintiff receive Factor 9 when "injured, bleeding or surgery," defendant reasonably determined,

18   based on the record before him, that a simple tooth extraction with minimal bleeding did not

19   warrant prophylactic administration of Factor 9.  In addition, defendant determined that any risk

20   was minimized by the availability of Factor 9 at the prison.  Based on these facts, defendant

21   reasonably inferred that plaintiff did not face a substantial risk of serious harm by failing to

22   receive Factor 9 prior to the extraction.

23   Moreover, to the extent it could be argued that an inference of serious risk could be made

24   from the facts described above, there is no evidence that defendant drew that inference.  Farmer,

25   511 U.S. at 837 (to act with deliberate indifference, the official must *both* be aware of facts from

26   which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also

27   draw the inference.)

28   ////

1    Plaintiff may be claiming that defendant is responsible for his failure to receive Factor 9 at

2    the prison.  However, there is no evidence that the failure of prison officials to know that Factor 9

3    was available at the prison was based on any actions by defendant.  In other words, plaintiff has

4    provided no evidence linking defendant to plaintiff's delay in receipt of Factor 9.

5    In conclusion, for the reasons discussed above, the undersigned finds that defendant did

6    not act with deliberate indifference by failing to administer Factor 9 to plaintiff before his tooth

7    extraction.  At most, defendant acted negligently.  However, negligence does not constitute a

8    violation of plaintiff's Eighth Amendment rights.  On these grounds, defendant is granted

9    summary judgment.

10    Accordingly, IT IS HEREBY ORDERED that:

11    1.  Defendant's summary judgment motion (ECF No. 84) is granted;

12    2.  Plaintiff's motion to vacate and motion and for an extension of time (ECF Nos. 83, 88)

13    are denied; and

14    3.  Plaintiff's motion of review (ECF No. 93) is granted with respect to plaintiff's request

15    that the court review the record to determine whether he submitted any evidence in support of his

16    claims.

17    Dated:  November 10, 2014

18

19    Pea1751.sj

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

14